288 July 8, 2026 No. 638

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of M. A. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. D.,
*Appellant.*

Douglas County Circuit Court
25JU0203; A188418 (Control)

In the Matter of J. J. A. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. D.,
*Appellant.*

Douglas County Circuit Court
25JU02033; A188419

Ann Marie Simmons, Judge.

Submitted January 22, 2026.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sarah Peterson, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Interim Deputy Attorney General, and Shannon T. Reel, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, Egan, Judge, and Jacquot, Judge.

JACQUOT, J.

Order requiring mother to participate in psychological evaluation reversed; otherwise affirmed.

**JACQUOT, J.**

This consolidated juvenile dependency case presents a first impression question regarding whether the requirement to provide active efforts in cases subject to the Indian Child Welfare Act (ICWA), 25 USC sections 1901 to 1963, and the Oregon Indian Child Welfare Act (ORICWA), ORS 419B.600 to 419B.665, alters the standard for ordering a psychological evaluation. A dispositional hearing regarding whether a psychological evaluation for mother was needed occurred less than ten days after the conclusion of the jurisdictional hearing.[1] At the time of the psychological evaluation hearing, mother had not used drugs in two months, was already attending substance abuse treatment five days per week and had agreed to engage in treatment to improve the quality of her relationship with father. After the hearing, the juvenile court ordered mother to engage in a psychological evaluation.

On appeal, mother contends that the Oregon Department of Human Services (ODHS) failed to meet its burden to prove that mother "needed" the psychological evaluation. ODHS responds that the record supports that mother needed a psychological evaluation in order for ODHS

"to better target services in light of [mother's] long-standing substance abuse issues which began at a young age, and to help address whether there is neurological damage from that use that impacted [mother] and her ability to function, and whether she had an underlying mental health issue or another issue that made it more difficult for [mother] to treat her addiction."

Based on the specific facts of this record and for the reasons provided below, we reverse the order requiring mother to participate in a psychological evaluation.

We review a juvenile court's order requiring a parent to submit to a psychological evaluation for legal error. *Dept. of Human Services v. F. J. M.*, 370 Or 434, 444-47, 520 P3d 854 (2022) (so reviewing). "We view the evidence, as supplemented and buttressed by permissible derivative inferences,

---

[1] The parties and the court resolved other dispositional questions at the close of the jurisdictional hearing. The hearing at issue in this appeal focused solely on whether to order each parent to submit to psychological evaluations.

in the light most favorable to the trial court's disposition," *Dept. of Human Services v. J. A. G.*, 328 Or App 739, 741, 538 P3d 587 (2023), in this case, an order for mother to submit to a psychological evaluation.

## FACTS AND PROCEDURAL HISTORY

Mother has twin children, who were two years old at the time of the jurisdictional and dispositional hearings. The children are members of the Cow Creek Band of Umpqua Tribe of Indians, and thus, this case is subject to ICWA and ORICWA. The juvenile court asserted jurisdiction over the children, and we affirmed the jurisdictional determinations in *Dept. of Human Services v. C. D.*, 347 Or App 362 (2026) (nonprecedential memorandum opinion) and *Dept. of Human Services v. J. G. O.*, 347 Or App 368 (2026) (nonprecedential memorandum opinion). As to mother, jurisdiction was asserted based on mother's substance abuse, mother's unwillingness or inability to protect the children from father's chronic substance use and behaviors,[2] and parents' "unhealthy, codependent, and volatile relationship which creates a chaotic and unsafe environment for the child[ren]."

At the end of the jurisdictional hearing, the juvenile court expressly declined to find that either parent had a mental health disorder or diagnosis. The court suggested that, over time, if addressing substance abuse matters did not ameliorate the issues with parents' abilities to parent, the jurisdictional petition and judgment "may" need to be amended.

Less than ten days later, ODHS filed a motion seeking an order to require both parents to submit to psychological evaluations "to correct the circumstances that resulted in wardship and to prepare the parents to resume the care of the ward[s]." In its motion, ODHS asserted that "[b]oth parents have been using drugs since youth" and that "[n]either parent has successfully engaged in treatment or maintained sobriety for a meaningful amount of time." The

_____

[2] The judgment appears to contain an error—listing the parents' unwillingness or inability to protect the children from the other parent's chronic substance use and behaviors as only a jurisdictional basis with regard to father. The parties appear to agree that that basis equally applies to mother. We accept that framing provided by the parties.

motion also highlighted the "volatile" relationship between mother and father. The tribe supported the motion. A hearing was held the following day. During the hearing, the only witness was an ODHS caseworker assigned to the family.[3]

## ANALYSIS

Pursuant to ORS 419B.387, if a juvenile court finds "that treatment or training is needed by a parent to correct the circumstances that resulted in wardship or to prepare the parent to resume the care of the ward," the court may order the parent to participate in a psychological evaluation, if doing so is in the best interest of the ward. *F. J. M.*, 370 Or at 445-46. The party seeking a psychological evaluation order has the burden to establish necessity. *J. A. G.*, 328 Or App at 746.

The "juvenile court must engage in a fact-specific inquiry that depends on the circumstances of [the] individual case." *F. J. M.*, 370 Or at 447. For an order to be proper, a psychological evaluation must be "needed" and "more than tenuously" connected to the jurisdictional bases that the ordered treatment is meant to address. *Id.* at 448. Treatment is needed if it is "necessary or required," and it must serve the purpose of "ameliorating the circumstances that resulted in the wardship or preparing the parent to resume care of the ward." *Id.* at 447. A finding that treatment is needed must be supported by the evidentiary record. *Id.*

A variety of factors may be considered in determining whether a psychological evaluation is needed, including:

"(1) the circumstances that resulted in wardship * * *; (2) the extent to which the treatment that the court is considering

---

[3] The juvenile court and the parties took part in an exchange regarding whether the court would take judicial notice and "incorporate" evidence or testimony from the jurisdictional hearing. The attorneys representing mother and father did not object to doing so, and the court responded "ok." The court did not enter a transcript or other evidence from the jurisdictional hearing as an exhibit for the dispositional hearing. However, it appears that the parties and the court relied on information that was established during the jurisdictional hearing. Because of the framing and lack of objections by the parties, we assume without deciding that information established during the jurisdictional hearing and which is undisputed by the parties could be considered at the psychological hearing, and we consider such information in our review.

will correct those circumstances or otherwise prepare the parent to resume the ward's care; (3) the availability of alternatives to the treatment that the court is considering that will correct the circumstances that resulted in wardship or otherwise prepare the parent to resume the ward's care; (4) the effectiveness of a parent's prior attempts, if any, to ameliorate those circumstances; and (5) the length of time over which those prior attempts were made."

*F. J. M.*, 370 Or at 447-48.

A psychological evaluation is a process conducted by a clinician designed to assess an individual's social, cognitive, developmental, emotional, personality, behavioral and other related functioning. Based on a combination of reviewing information about an individual's past and personally evaluating the individual, a psychological evaluation may result in diagnoses or clinical opinions about an individual's motivations, beliefs, limitations, or capabilities. *See, e.g.*, *Dept. of Human Services v. D. W. M.*, 346 Or App 827, 829-30, 586 P3d 938 (2026) (psychological evaluation involved extensive assessment of the father and resulted in diagnosis); *Dept. of Human Services v. L. M. K.*, 319 Or App 245, 249-50, 510 P3d 278 (2022) (psychological evaluation of a father involved assessment of the father's mental health conditions, social difficulties, and other personal traits). There is a "potential" for "misuse of a psychological evaluation," and such an evaluation "*cannot* be used as a 'discovery mechanism' to determine *if* services for treatment and training are needed." *Dept. of Human Services v. W. C. T.*, 314 Or App 743, 766, 501 P3d 44 (2021) (quoting *Dept. of Human Services v. D. R. D.*, 298 Or App 788, 799, 450 P3d 1022 (2019) (first emphasis added; second emphasis in *W. C. T.*)). It is not appropriate or permissible to order a psychological evaluation in all cases, as such an assessment is intrusive and should be ordered only when needed. *F. J. M.*, 370 Or at 447-48; *W. C. T.*, 314 Or App at 775-76 (parents must be protected from being compelled to participate in "ill-advised psychological evaluations").

The circumstances that resulted in wardship include mother's long-term substance abuse, her inability or unwillingness to protect the children from father's substance abuse, and her "unhealthy codependent and volatile

relationship" with father. At the close of the jurisdictional and dispositional hearing, mother was willing to participate in treatment voluntarily. The court ordered her to do so, including substance abuse assessments and any recommended treatment, substance use testing as directed by treatment providers, and individual therapeutic counseling. The parents were also ordered to participate in and successfully complete parent education, and to "engage in relationship education and complete any services that are recommended." The court made clear that the relationship education and treatment could take the form of a parenting program offered by the Tribe, participation in the local Family Faith and Relationship Advocates (FARA) programming, or another similar treatment program. The parties communicated that the parents were planning to participate in a family parenting program offered by the Tribe and family counseling. The court and the parties agreed that the parents had access to more services through the Tribe than what was available for most families in juvenile dependency cases that are not subject to ICWA.

At the time of the dispositional hearing, mother had not used drugs in two months and was attending substance abuse treatment through the Tribe five days per week. The children were residing with mother under an in-home safety plan. There was no evidence that mother was failing or refusing to participate in services. The court found that mother was currently engaged in services and planning to begin FARA shortly. There is no indication that a psychological evaluation would reveal a treatment or service that mother was not already ordered to participate in or taking advantage of. Those circumstances weigh against the propriety of a psychological evaluation order; it is unclear what would make a psychological evaluation "necessary or required," *F. J. M.*, 370 Or at 447, given that mother was already participating in all recommended services to ameliorate the jurisdictional bases. *Cf. W. C. T.*, 314 Or App at 777 (affirming psychological evaluation order where, during a previous ODHS case, the mother had failed to complete drug and alcohol treatment, the mother was resisting treatment recommendations, and the mother was continuing to use methamphetamines).

Regarding the fourth and fifth factors from *F. J. M.*, ODHS had only been involved with the family for a relatively brief period of time[4]; ODHS moved for a psychological evaluation order approximately 10 days after the jurisdictional hearing and only a couple of months after the petitions for jurisdiction were filed. In contrast, in *Dept of Human Services v. R. M. E.*, 336 Or App 853, 854-56, 561 P3d 1166 (2024), we affirmed a psychological evaluation order where the mother continued to engage in behavior related to the jurisdictional bases after *more than one year* of wardship and ODHS involvement.

We have reached similar holdings in a number of other cases. *Dept. of Human Services v. R. W. C.*, 324 Or App 598, 599, 607, 526 P3d 1195, *rev den*, 371 Or 308 (2023) (affirming a psychological evaluation order where the child was within the court's jurisdiction for nearly two years, and the "father had difficulty understanding information given to him by his treatment providers," among other challenges that persisted despite receiving services); *F. J. M.*, 370 Or at 437 (affirming psychological evaluation order where challenges persisted and "[O]DHS had been involved with the family for many years"); *W. C. T.*, 314 Or App at 746, 777 (affirming psychological evaluation order where the juvenile court originally took jurisdiction in 2014, the mother failed to successfully complete drug and alcohol treatment during the case, child was returned to the mother in 2016, ODHS involvement with the family continued from 2018 to 2020, and the child was removed from mother's care a second time in 2020).

Aside from the factors enumerated in *F. J. M.*, on appeal, the state argues that the following testimony supports the psychological evaluation order:

"[ODHS's Attorney]: In what ways does getting a psych[o-logical] evaluation help you sort of help the parent succeed?

"[ODHS Caseworker]: So it helps us to understand how a parent learns best. If we need to provide them, you know,

_____

[4] The record indicates that ODHS previously assessed mother and the twins in June 2023, when the twins were born prematurely and substance affected. Mother voluntarily engaged in both outpatient and inpatient programs. She was sober for 80 days at the close of that assessment. ODHS did not argue that that initial assessment had any bearing on its motion for a psychological evaluation order.

with extra services. Maybe hearing it doesn't work for them. Maybe they need to be hands on. Maybe it needs to be written out for them. And as the ICWA caseworker it's my job to provide active efforts to the family. And so that would be something that I would do if that was needed.

"[ODHS's Attorney]:   Okay. And so you, you can use the, the psychological evaluations to tailor your efforts in supporting this family?

"[ODHS Caseworker]: Yes. I can.

"[ODHS's Attorney]:     *** [I]s there anything else you think that would be particularly helped by having a psychological evaluation?

"[ODHS Caseworker]:   Yes. Understanding really where the drive comes from to use substances. And then also, the concerns that we have around the unhealthy relationship that the parents have and how we can best help both of them overcome that."

As noted, though, mother was already engaged in or poised to begin participation in all available services related to the jurisdictional bases, including a variety of programs related to substance abuse, parenting, and healthy relationships. The caseworker articulated general concerns about both parents and the jurisdictional bases but did not establish any specific difficulties ODHS was having in communicating with mother or in connecting mother with resources. *Cf. R. W. C.*, 324 Or App at 606-07 (affirming psychological evaluation order, in part, because several caseworker and service provider witnesses "expressed concerns about [the] father's [limited] ability to remember and understand information"); *D. R. D.*, 298 Or App at 793, 800 (affirming psychological evaluation order where the father was not engaging in substance abuse treatment, and ODHS and other providers opined that a psychological evaluation could elucidate how to motivate the father to engage in treatment services and develop a relationship with his child).

In *W. C. T.*, 314 Or App at 778, 780, we reversed a psychological evaluation order for the father, noting that "[t] here was no present indication of substance abuse by [the] father," the father was not engaging in services at the time of the relevant hearing, but he had successfully completed

drug and alcohol treatment during a prior juvenile dependency case. We recognized that "[e]xcept in broad, generic terms, *** [O]DHS did not offer testimony how a psychological evaluation related to [the] father's need for services." *Id.* at 778. In this case, ODHS's offered motion and testimony about the need for mother to undergo a psychological evaluation was broad and generic, and mother was not engaging in methamphetamine use at the time of the hearing.[5] *See also J. A. G.*, 328 Or App at 741-42, 746 (third-party reports that the "father had suffered some sort of trauma as a child, and that a mental health assessment would benefit father in dealing with his childhood trauma, and thus, in becoming a better parent," were insufficient for a psychological evaluation order, even though ODHS had been involved with the father in a past case, and there was speculation about other concerns).

ODHS argues that a psychological evaluation order for mother is appropriate because, under ICWA and ORICWA, "ODHS must provide active efforts in this case,"[6] and a psychological evaluation can help "tailor [ODHS's] efforts to best support the family."

ICWA was enacted to "protect, preserve, and advance the integrity of Indian families" in juvenile dependency courts. Felix Cohen, *Handbook of Federal Indian Law* § 11.01[1], at 820 (2005 ed); *see also* Sophia Gatowski, Alicia Summers, and Bree Bussey, *The Effectiveness of an ICWA Court at Achieving Improved ICWA Implementation and Outcomes: A Pre-Post Intervention Study*, 74 Juv & Fam Ct J 51, 52 (2023) (ICWA was enacted in response to decades-long child welfare policies that intentionally and systemically

---

[5] For example, in addition to the portion of testimony quoted above, the ODHS caseworker testified that, in other cases, understanding more about a parent's brain had been helpful. The caseworker testified, "It sounds like substance use started at a pretty young age and we know that that can affect the brain development. *** [W]e would like to know *** if there are any issues with that, how we can help them." However, she did not testify to any particular challenges she observed about mother with regard to brain development, difficulty providing services to mother, communication difficulties, or other symptoms or issues that were not already being addressed by the services mother was receiving. *See J. A. G.*, 328 Or App at 746 ("The caseworker's beliefs about what would be helpful, unsupported by competent evidence, is not enough.").

[6] In juvenile dependency cases not subject to ICWA and ORICWA, ODHS is required to engage in "reasonable efforts." ORS 419B.340.

removed American Indian and Alaska Native children from their families and culture, causing "massive trauma *** which continues today ***."). ORICWA mirrors its federal counterpart, but was implemented to address inconsistent application of ICWA in Oregon state courts and

> "to protect the health and safety of Indian children and the stability and security of Indian tribes and families by promoting practices designed to prevent the removal of Indian children from their families and, if removal is necessary and lawful, to prioritize the placement of an Indian child with the Indian child's extended family, Tribe and/or tribal community."

ORS 419B.600. In furtherance of that purpose, ORICWA implements a higher burden of proof in juvenile dependency proceedings. OAR 413-115-0130.

ORICWA's intent, as further explained by regulation and case law, is to require that the state and its agencies remain sensitive to the violent histories between the state and Indian children in the context of juvenile dependency cases. *See Dept. of Human Services v. A. R. E.*, 340 Or App 73, 74 n1, 571 P3d 211 (2025) ("Our state acknowledges the detrimental historic policies that contributed to 'an alarmingly high percentage of Indian families [being] broken up by the removal, often unwarranted, of their children[.]'" (Quoting OAR 413-115-0010 (brackets in *A. R. E*).)). The statutory scheme charges ODHS with centering the child's safety and cultural heritage, and also emphasizes taking additional care to consider how traumatic histories of Indian removal and assimilation may manifest in decision-making and program delivery at agency and individual scales. Both ICWA and ORICWA caution us to avoid replicating vestiges of discriminatory historical practices that must be left in the past.[7] *See A. R. E.*, 340 Or App at 78 n 3 (acknowledging

---

[7] In 2019 in Oregon, although American Indian and Alaska Native children comprised only 1.6 percent of the child population, they were disproportionately represented in the Oregon foster care system, comprising 4.5 percent of children in foster care. *Oregon Indian Child Welfare Act (ORICWA) Judicial Benchbook* at 1 n1 (2021), https://www.courts.oregon.gov/programs/jcip/Documents/OregonIndianChildWelfareActBenchbook.pdf. In 2025, 6 percent of children in the Oregon foster care system were American Indian or Alaska Native. ODHS Oregon Child Welfare Data and Reports, Child Welfare Public Data, https://www.oregon.gov/odhs/data/pages/cw-data.aspx (accessed June 8, 2026).

past failures "'to recognize the essential Tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families'" (quoting U. S. Department of the Interior, Bureau of Indian Affairs, *Guidelines for Implementing the Indian Child Welfare Act* 54 (Dec 2016), https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf (accessed Apr 16, 2025)).

ORS 419B.645 defines active efforts as "efforts that are affirmative, active, thorough, timely and intended to maintain or reunite an Indian child with the Indian child's family." Whether ODHS has engaged in conduct that constitutes "active efforts" is a separate analysis from whether ODHS has met its evidentiary burden for any particular motion, in this case, whether ODHS met its evidentiary burden to show that mother's submission to a psychological evaluation was "needed or required." ORICWA requires a higher burden of proof as compared to the requisite burdens of proof in juvenile dependency cases not subject to ICWA and ORICWA. OAR 413-115-0130; *see, e.g.*, ORS 419B.310 (facts supporting juvenile dependency jurisdiction must be found by a preponderance of competent evidence, or "[i]f the child is an Indian child, by clear and convincing competent evidence").

The efforts by ODHS and the Tribe to best understand how to support mother and do everything possible to reunify the family are admirable. Still, we do not think ICWA or ORICWA lower the threshold showing required by the proponent of a treatment order before the juvenile court can properly order a parent to subject themselves to such an invasive examination.[8] The "juvenile court's authority to order treatment is not unlimited," and it is not appropriate to order a parent to submit to "evaluations and testing in every case." *F. J. M.*, 370 Or at 446-47 (internal quotation marks omitted).

---

"Not only are [American Indian and Alaska Native] children more likely to enter foster care, but they are also more likely to experience disparate outcomes in comparison with their peers." Alicia Summers, *Exploring Indian Child Welfare Act Implementation and Case Outcomes*, 74 Juv & Fam Ct J 37, 38 (2023).

[8] ICWA and ORICWA, which were designed to reduce inequity, are not meant to make it harder to reunite families, or to justify imposing unnecessary services to make sure nothing is missed.

Ordering an individual to submit to a psychological evaluation "is a very intrusive provision that can expose a parent to significant risk in a case (as well as possibly benefit them)." *Dept. of Human Services v. A. F.*, 295 Or App 69, 73, 433 P3d 459 (2018) (internal quotation marks omitted); *see also W. C. T.*, 314 Or App at 776 (the predicate findings required before a psychological evaluation can be ordered "protect[] parents against ill-advised psychological evaluations"). In this case, we see no evidence of an extant problem related to the jurisdictional bases that was not already being addressed by services. Ordering services that are not necessary does not make efforts any more active. Our analysis would likely be different if evidence of challenges arises, such as treatment ineffectiveness, comprehension problems or retention deficit by mother, or if the problematic parental behavior recurs.

Order requiring mother to participate in psychological evaluation reversed; otherwise affirmed.